BRIAN G. ARNOLD (CA 186007)
barnold@thompsoncoburn.com
DAVID B. JINKINS (MO 49254) (*pro hac vice* pending)
djinkins@thompscoburn.com
MATTHEW A. BRAUNEL (MO 50711) (*pro hac vice* pending)
mbraunel@thompsoncoburn.com
ALAN H. NORMAN (MO 38555) (*pro hac vice* pending)
anorman@thompsoncoburn.com
STEVEN E. GARLOCK (MO 38346) (*pro hac vice* pending)
sgarlock@thompsoncoburn.com
ROBERT D. GERLACH (MO 67110) (*pro hac vice* pending)
rgerlach@thompsoncoburn.com
THOMPSON COBURN LLP
2029 Century Park E #1900
Los Angeles, CA 90067

## CENTRAL DISTRICT OF CALIFORNIA
## UNITED STATES DISTRICT COURT
## WESTERN DIVISION

| | |
|---|---|
| MOBILE TECH., INC. d/b/a MOBILE TECHNOLOGIES INC. and MTI <br><br> Plaintiff, <br><br> v. <br><br> INVUE SECURITY PRODUCTS INC. <br> Defendant. | Case No.: 2:17-cv-7491 <br><br> **COMPLAINT FOR INJUNCTION AND DAMAGES FOR:** <br><br> **(1) PATENT INFRINGEMENT** <br> **(2) FEDERAL UNFAIR COMPETITION (LANHAM ACT)** <br> **(3) VIOLATION OF CALIFORNIA CALIFORNIA BUSINESS AND PROFESSION CODE §§ 17200 ET SEQ. AND 17500** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff Mobile Tech, Inc. ("MTI") states as follows for its Complaint of Patent Infringement, Federal Unfair Competition, and Violation of California Business and Professions Code §§ 17200 *et seq.* and 17500, against Defendant InVue Security Products Inc. ("InVue").

## NATURE OF THE ACTION

1. For more than 38 years, MTI has been a global leader in device display technologies for consumer electronics. MTI has developed numerous solutions that deliver the highest level of merchandising security for consumer electronics. As a leading innovator in this area, MTI has received more than 15 patents worldwide for its mobile device display technologies, including U.S. Pat. No. 9,786,140 (the '140 Patent). In addition, MTI has more than 40 pending patent applications. MTI's investment in innovation has contributed to the success of its products.

2. InVue copied MTI's innovative technology rather than independently developing its products. InVue has released multiple product lines infringing the '140 Patent and copying technology disclosed in applications to which the '140 Patent claims priority. MTI files this suit to stop InVue's continued infringement.

3. MTI is further filing this suit to stop the false and misleading representations that InVue has made, and continues to make, in its marketing and other materials about the quality, nature, and characteristics of MTI's products. InVue's false and misleading representations disparage MTI's products in an attempt to gain an unfair competitive advantage in the marketplace.

## PARTIES

4. MTI is a corporation existing under the laws of the state of Indiana, with a place of business at 1050 NE 67th Ave., Hillsboro, OR 97124.

5. On information and belief, InVue is a corporation existing under the laws of the State of Ohio, with an office at 8840 Flower Rd # 110, Rancho Cucamonga, CA 91730. On information and belief, InVue's products are manufactured outside

of the United States, shipped into ports in the United States, including at least the Port of Los Angeles, and subsequently sent to Rancho Cucamonga, CA. On information and belief, InVue has been registered to do business in the State of California since February 25, 1999. InVue has therefore purposefully availed itself of the privilege of conducting business within the State of California and has therefore established sufficient minimum contacts with the State.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1338(a) (any Act of Congress relating to patents), and 15 U.S.C. 1121(a) (original jurisdiction for all actions arising under Chapter 15 of United States Code). This Court has supplemental jurisdiction over the claims arising under California state law pursuant to 28 U.S.C. § 1367.

7. This Court has personal jurisdiction over InVue because it has committed, and continues to commit, acts of infringement that violate 35 U.S.C. § 271 by importing infringing products into the State of California and by placing infringing products into the stream of commerce with knowledge that these infringing products will be sold throughout the United States, including in the State of California and in this District. Moreover, as discussed above, on information and belief, InVue has purposefully availed itself of the privilege of conducting business within the State of California and has therefore established sufficient minimum contacts with the State.

8. Venue is proper within this District for MTI's claim of patent infringement under 28 U.S.C. § 1400(b) (special patent venue statute). InVue has an office in Rancho Cucamonga, CA and therefore maintains a "regular and established place of business" in this District. Additionally, on information and belief, InVue has committed, and continues to commit, acts of infringement in this District.

9.  Venue is proper within this District for MTI's claim of unfair competition under 28 U.S.C. § 1391 (b)(1).  InVue resides within this District under 28 U.S.C. § 1391(c)(2) because it is subject to the Court's personal jurisdiction, as discussed above.

## BACKGROUND
## MTI'S UTILITY PATENTS

10. MTI has developed cutting-edge technologies for mobile device display and merchandising security solutions.  MTI's products are used to provide security for consumer electronics, such as mobile devices and tablets, being displayed at retail stores.  MTI's products enable a potential consumer to interact with a consumer electronic while still providing security, as shown in the image below:



11. MTI protects its cutting-edge technologies for mobile device display and merchandising security solutions through a broad range of intellectual property rights, including United States patents. Among the patents MTI has been awarded is U.S. Pat. No. 9,786,140 (the '140 Patent), entitled "Display for hand-held electronics."  A true and accurate copy of the '140 Patent is attached as Exhibit A.

- 4 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

12. The '140 Patent claims an invention that advanced the field of mobile device display technologies. Generally speaking, the '140 Patent relates to an apparatus for use in mounting an electronic device, for example, a cell phone, camera, or tablet, to a display. A puck assembly is adapted to receive the electronic device and interact with a base assembly. The apparatus further includes a tether assembly that is adapted to connect the puck assembly with the base assembly. The tether assembly includes a portion that is adapted to transmit an optical signal. An electrical connection is formed when the puck assembly engages the base assembly, and the electrical connection is broken when the puck assembly is lifted from the base assembly.

13. Independent Claim 26 of the '140 Patent is a representative claim and recites as follows:

A cable management apparatus for use in mounting an electronic device to a display, the apparatus comprising:
a puck assembly adapted to receive an electronic device;
a base assembly; and
a tether assembly adapted to connect the puck assembly with the base assembly, wherein the tether assembly comprises a portion that is adapted to transmit an optical signal;
wherein the puck assembly is adapted to be moveable between (1) a rest position in which the puck assembly engages with the base assembly and (2) a lift position in which the puck assembly disengages from the base assembly while the puck assembly and base assembly remain connected to the tether assembly;
wherein the base assembly further comprises (1) base assembly circuitry configured to receive power from a power source, and (2) a base assembly electrical contact connected to the base assembly circuitry;
wherein the puck assembly comprises (1) a puck assembly electrical contact, (2) puck assembly circuitry connected to the puck assembly electrical contact, and (3) a connector connected to the puck assembly circuitry and, a power cable that is connectable to a power input of the electronic device;
wherein the base assembly contact and the puck assembly contact are adapted to contact each other when the puck assembly is in the rest position to form an electrical connection between the puck assembly circuitry and the base assembly circuitry;

wherein the puck assembly circuitry is configured to, when the puck assembly is in the rest position, draw power from the power source through the electrical connection and provide the drawn power to the connector for charging the electronic device via the power cable; and

wherein the base assembly contact and the puck assembly contact are adapted to lose contact with each other when the puck assembly is in the lift position to thereby break the electrical connection.

14. MTI owns all rights, title, and interest in the '140 Patent. The '140 Patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code.

## INVUE'S INFRINGING PRODUCTS

15. InVue elected to copy MTI's patented technology claimed in the '140 Patent rather than innovate and develop its own technology for mobile device display and merchandising security solutions. InVue has released several infringing products, including, but not limited to, the POD Series 1050, the POD Series 1060, and the POD Series 1560.

16. InVue has not obtained permission from MTI to manufacture, offer to sell, sell, use in the United States, or import into the United States any product or method covered by the '140 Patent.

17. On information and belief, InVue makes, uses, offers to sell, sells and/or imports into the United States the POD Series 1060. The POD Series 1060 infringes at least Claim 26. An example of the POD Series 1060 is shown below:

- 6 -



18.  As an example, the POD Series 1060 infringes at least Claim 26 because it is an apparatus for use in mounting an electronic device, such as a cell phone, camera, or tablet, to a display.  As seen in the image above, the POD Series 1060 includes a puck assembly that receives the electronic device and a base assembly. The POD Series 1060 further includes a tether assembly connecting the puck assembly with the base assembly, with the tether assembly comprising a portion that transmits an optical signal.  The puck assembly of the POD Series 1060 is capable of being moved between a rest position in which the puck assembly engages with the base assembly and a lift position in which the puck assembly disengages from the base assembly while the puck assembly and base assembly remain connected to the tether assembly.  The base assembly of the POD Series 1060 includes base assembly circuitry that receives power from a power source and a base assembly electrical contact connected to the base assembly circuitry.  The puck assembly of the POD Series 1060 comprises a puck assembly electrical contact, puck assembly circuitry connected to the puck assembly electrical contact, and a connector connected to the puck assembly circuitry, and a power cable that is

connectable to a power input of the electrical device. The base assembly contact and the puck assembly contact of the POD Series 1060 contact each other when the puck assembly is in the rest position to form an electrical connection between the puck assembly circuitry and base assembly circuitry, and the puck assembly circuitry draws power from the power source through the electrical connection and provides the drawn power to the connector for charging the electronic device via the power cable when the puck assembly is in the rest position. The base assembly contact and the puck assembly contact of the POD Series 1060 lose contact with each other when the puck assembly is in the lift position to thereby break the electrical connection.

19. On information and belief, InVue makes, uses, offers to sell, sells and/or imports into the United States the POD Series 1560. The POD Series 1560 infringes at least Claim 26. An example of the POD Series 1560 is shown below:



20. As an example, the POD Series 1560 infringes at least Claim 26 because it is an apparatus for use in mounting an electronic device, such as a cell phone,

camera, or tablet, to a display. As seen in the image above, the POD Series 1560 includes a puck assembly that receives the electronic device and a base assembly. The POD Series 1560 further includes a tether assembly connecting the puck assembly with the base assembly, with the tether assembly comprising a portion that transmits an optical signal. The puck assembly of the POD Series 1560 is capable of being moved between a rest position in which the puck assembly engages with the base assembly and a lift position in which the puck assembly disengages from the base assembly while the puck assembly and base assembly remain connected to the tether assembly. The base assembly of the POD Series 1560 includes base assembly circuitry configured to receive power from a power source and a base assembly electrical contact connected to the base assembly circuitry. The puck assembly of the POD Series 1560 comprises a puck assembly electrical contact, puck assembly circuitry connected to the puck assembly electrical contact, and a connector connected to the puck assembly circuitry, and a power cable that is connectable to a power input of the electrical device. The base assembly contact and the puck assembly contact of the POD Series 1560 contact each other when the puck assembly is in the rest position to form an electrical connection between the puck assembly circuitry and base assembly circuitry, and the puck assembly circuitry draws power from the power source through the electrical connection and provides the drawn power to the connector for charging the electronic device via the power cable when the puck assembly is in the rest position. The base assembly contact and the puck assembly contact of the POD Series 1560 lose contact with each other when the puck assembly is in the lift position to thereby break the electrical connection.

21. On information and belief, InVue makes, uses, offers to sell, sells and/or imports into the United States the POD Series 1050. On information and belief, the

POD Series 1050 infringes at least Claim 26. An example of the POD Series 1050 is shown below:



22. As an example, on information and belief, the POD Series 1050 infringes at least Claim 26 because it is an apparatus for use in mounting an electronic device, such as a cell phone, camera, or tablet, to a display. As seen in the image above, the POD Series 1050 includes a puck assembly that receives the electronic device and a base assembly. On information and belief, the POD Series 1050 further includes a tether assembly connecting the puck assembly with the base assembly, with the tether assembly comprising a portion that transmits an optical signal. The puck assembly of the POD Series 1050 is capable of being moved between a rest position in which the puck assembly engages with the base assembly and a lift position in which the puck assembly disengages from the base assembly while the puck assembly and base assembly remain connected to the tether assembly. On information and belief, the base assembly of the POD Series 1050 includes base assembly circuitry configured to receive power from a power source and a base assembly electrical contact connected to the base assembly circuitry. On information and belief, the puck assembly of the POD Series 1050 comprises a puck assembly electrical contact, puck assembly circuitry connected to the puck assembly electrical contact, and a connector connected to the puck

assembly circuitry, and a power cable that is connectable to a power input of the electrical device. On information and belief, the base assembly contact and the puck assembly contact of the POD Series 1050 contact each other when the puck assembly is in the rest position to form an electrical connection between the puck assembly circuitry and base assembly circuitry, and the puck assembly circuitry draws power from the power source through the electrical connection and provide the drawn power to the connector for charging the electronic device via the power cable when the puck assembly is in the rest position. On information and belief, the base assembly contact and the puck assembly contact of the POD Series 1050 lose contact with each other when the puck assembly is in the lift position to thereby break the electrical connection.

## INVUE'S UNFAIR COMPETITION TO MISLEAD CUSTOMERS

23. MTI and InVue are in direct competition with each other, competing in the areas of mobile device display technologies and merchandising security for consumer electronics.

24. InVue has made, and continues to make, false and misleading representations in marketing and other materials in connection with advertising its products. InVue's false and misleading representations are in an effort to confuse actual and potential customers and compete unfairly with MTI in the marketplace.

25. In particular, InVue has released at least one marketing video that makes false and misleading representations about the nature, quality, and characteristics of MTI's products. During the marketing video entitled "InVue Security – Cost of Ownership," which was available on and before October 10, 2017 and currently still is available for MTI's customers and potential customers to view online at https://vimeo.com/134841888, the narrator states the following from timestamp 00:45 to timestamp 1:09 of the video:

> In a side-by-side test of a competitor's recoiler and ours, the competitor's recoiler failed after just six months. The InVue recoiler continued for over 60,000 pulls. That's over three years of reliable service.

While making these statements, the sequence illustrated by Figures 1-7 below is being shown in the video. In a blatant effort to confuse, InVue briefly swaps the "competitor's" product (which is MTI's Freedom Micro™) with some other product. This can be seen by comparing, for example, Figures 1-3 (which depicts MTI's Freedom Micro™) with Figure 4 (which depicts some other product not manufactured by MTI).



**Figure 1: Screenshot of Video Timestamp 00:47**



**Figure 2: Screenshot of Video Timestamp 00:49**



**Figure 3: Screenshot of Video Timestamp 00:51**



**Figure 4: Screenshot of Video Timestamp 00:53**



The competitors recoiler failed after just 6 months.

**Figure 5: Screenshot of Video Timestamp 00:57**



**Figure 6: Screenshot of Video Timestamp 01:04**



**Figure 7: Screenshot of Video Timestamp 1:08**

26.  MTI's Freedom Micro™ has a unique appearance that is readily

recognized in the areas of mobile device display technologies and merchandising

security for consumer electronics. An image of MTI's Freedom Micro™ is shown below:



27. During the video sequence displaying the purported "side-by-side test" run between MTI's Freedom Micro™ and InVue's product, InVue falsely represents the nature, quality, and characteristics of MTI's Freedom Micro™. Notably, InVue swaps out MTI's Freedom Micro™ with some other product for only a few seconds (timestamp 00:52 to timestamp 00:54) when showing the alleged failure of the recoiler of the MTI Freedom Micro™.

28. While InVue's action of swapping the MTI Freedom Micro™ with some other product is difficult to detect when watching the video at regular speed, the swap can be readily identified when comparing the screenshot shown in Figure 2 with the screenshot shown in Figure 4. In the below comparison, Figures 2 and 4 have been cropped and enlarged to focus on the product appearing on the left:





Screenshot before failure displaying
MTI's Freedom Micro$^{TM}$
(from Figure 2 above)

Screenshot at failure displaying
some other product
(from Figure 4 above)

29.  There are several notable differences between MTI's Freedom Micro$^{TM}$ and the other product.  For example, as illustrated by the red arrows below, MTI's Freedom Micro$^{TM}$ has silver electrical contacts while the other product does not:





Screenshot before failure displaying
MTI's Freedom Micro$^{TM}$
(from Figure 2 above)

Screenshot at failure displaying
some other product
(from Figure 4 above)

30.  Additionally, as illustrated by the red circles below, MTI's Freedom Micro$^{TM}$ has a large central opening that enables the gray recoiler housing located within the post to be seen, while the other product has a smaller central opening:




Screenshot before failure displaying
MTI's Freedom Micro™
(from Figure 2 above)

Screenshot at failure displaying
some other product
(from Figure 4 above)

31.  In addition, as illustrated by the red arrows in the images below, the base plate that MTI's Freedom Micro™ is sitting on for the alleged "side-by-side test" has a different design than the base plate of the other product:




Screenshot before failure displaying
MTI's Freedom Micro™
(from Figure 2 above)

Screenshot at failure displaying
some other product
(from Figure 4 above)

32. After showing the recoiler fail (which occurs from timestamp 00:52 to timestamp 00:54), InVue inserts MTI's Freedom Micro™ back into the video, as shown in the comparison below:

  

Screenshot before failure displaying MTI's Freedom Micro™ (from Figure 2 above)

Screenshot at failure displaying some other product (from Figure 4 above)

Screenshot after failure displaying MTI's Freedom Micro™ (from Figure 6 above)

33. As can be seen above, MTI's Freedom Micro™ appears in Figure 2 and Figure 6, but not in Figure 4. In other words, the video displays MTI's Freedom Micro™ before and after the alleged failure of the recoiler, but not while the recoiler is actually failing. InVue swapped out MTI's Freedom Micro™ with another product (whose color also happens to be white) for the brief time period when the recoiler itself fails (timestamp 00:52 to timestamp 00:54).

34. On information and belief, InVue intentionally damaged MTI's Freedom Micro™ recoiler cable with some tool (*e.g.*, pliers) before placing it back into the video after timestamp 00:54. On information and belief, InVue intentionally damaged MTI's Freedom Micro™ recoiler cable to make it appear as though it was the same cable that failed during timestamp 00:52 to timestamp 00:54 of the video. On information and belief, the red arrow in the image below indicates where InVue intentionally damaged MTI's Freedom Micro™ recoiler cable:



35.  On information and belief, InVue's claim that its product outperformed MTI's Freedom Micro$^{TM}$ in a "side-by-side test" is a literal falsity.  Such is evidenced by the fact that InVue inconspicuously swaps out MTI's Freedom Micro$^{TM}$ for another product for only a brief time period to allegedly show when MTI's Freedom Micro$^{TM}$ failed.  Moreover, InVue provides no support or other evidence to establish that it even conducted a side-by-side test between its product and MTI's Freedom Micro$^{TM}$.

36.  Accordingly, InVue has made, and continues to make, false and misleading statements in an effort to mislead actual and potential customers of InVue (who are also potential customers or actual customers of MTI) in an effort to divert business away from MTI to InVue.

37.  InVue's statements have a tendency to deceive, and on information and belief have actually deceived, a substantial segment of the consuming public.  Such deception is material and likely to influence purchasing decisions.

38.  InVue has caused its falsely advertised goods to be advertised and/or sold throughout the United States, including in California and this District.  On information and belief, MTI has been injured by InVue's scheme to intentionally

misrepresent the nature, quality, and characteristics of MTI's Freedom Micro™ to divert business away from MTI to InVue.

## FIRST CLAIM FOR RELIEF
### (Direct Infringement of the '140 Patent)

39.  MTI fully incorporates by reference, as if set forth fully herein, the preceding paragraphs of this Complaint.

40.  On information and belief, InVue has directly infringed and continues to directly infringe one or more claims of the '140 Patent, including at least Claim 26, under one or more subsections of 35 U.S.C. § 271 by making, using, selling, and/or offering to sell in the United States, and/or importing into the United States one or more of the infringing products identified in this Complaint.

41.  On information and belief, InVue has gained profits by virtue of its direct infringement of the '140 Patent.

42.  MTI has sustained damages as a direct and proximate result of InVue's direct infringement of the '140 Patent.

43.  InVue's direct infringement of the '140 Patent has caused and is causing financial damages to MTI, for example, lost sales and revenue caused by InVue's sales of the infringing products.  InVue's direct infringement of the '140 Patent irreparably damages MTI, including, for example, avoiding MTI's right to exclude others from making, using, selling, or offering to sell in the United States or importing into the United States products embodying the invention claimed in the '140 Patent.

44.  InVue's direct infringement of the '140 Patent will continue unless enjoined by the Court under 35 U.S.C. § 283 and/or the equitable powers of the Court.

## SECOND CLAIM FOR RELIEF

### (Contributory Infringement of the '140 Patent)

45.  MTI fully incorporates by reference, as if set forth fully herein, the preceding paragraphs of this Complaint.

46.  At least as of the filing of this Complaint, InVue knew of the '140 Patent.

47.  InVue sells and continues to sell the infringing products to its customers (*e.g.*, an electronics store retailer or a wireless carrier storefront) with the intent that its customers will use and operate the infringing products in the United States in a manner that infringes the '140 Patent.

48.  InVue's infringing products are configured only for infringing use of the '140 Patent.  For example, when InVue's infringing products are received and installed by a customer (*e.g.*, an electronics store retailer or a wireless carrier storefront), at least Claim 26 of the '140 Patent is infringed.

49.  InVue's infringing products are not staple articles of commerce.

50.  InVue's infringing products are not suitable for substantial non-infringing use.

51.  InVue's infringing products are especially made or adapted for use in an infringement of the '140 Patent.

52.  The use of InVue's infringing products by InVue's customers (for example, after receipt from InVue and setup at an electronics store retailer or a wireless carrier storefront) constitutes direct infringement of the '140 Patent.

53.  On information and belief, InVue knows that the infringing products are not staple articles of commerce, are not suitable for substantial non-infringing use, and are especially made or adapted for use in a manner that infringes MTI's patent rights associated with '140 Patent.

54. InVue's actions constitute contributory infringement of the '140 Patent. InVue's contributory infringement of the '140 Patent causes financial damages to MTI, including, for example, lost sales and revenue caused by InVue's sales of the infringing products.

55. InVue's contributory infringement of the '140 Patent irreparably damages MTI, including, for example, avoiding MTI's right to exclude others from making, using, selling, or offering to sell in the United States or importing into the United States products embodying the invention patented in the '140 Patent.

56. InVue's contributory infringement of the '140 Patent will continue unless enjoined by the Court under 35 U.S.C. § 283 and/or the equitable powers of the Court.

57. InVue's infringing products are especially made or adapted for use in an infringement of the '140 Patent.

### THIRD CLAIM FOR RELIEF
### (Induced Infringement of the '140 Patent)

58. MTI fully incorporates by reference, as if set forth fully herein, the preceding paragraphs of this Complaint.

59. At least as of the filing of this Complaint, InVue knew of the '140 Patent.

60. InVue sells and continues to sell the infringing products to its customers (*e.g.*, an electronics store retailer or a wireless carrier storefront) with the intent that its customers will use and operate the infringing products in the United States in a manner that infringes the '140 Patent.

61. The infringing products are configured only for infringing use of the '140 Patent. For example, whenever the infringing products are received and installed by a customer (*e.g.*, an electronics store retailer or a wireless carrier storefront), at least Claim 26 of the '140 Patent is infringed.

62.  InVue provides its customers in the United States with instructions regarding the infringing use and operation of the infringing products.

63.  On information and belief, InVue trains its customers in the United States in the infringing use and operation of the infringing products.

64.  On information and belief, InVue has observed its customers using and operating one or more of the products identified in this Complaint in an infringing manner.

65.  On information and belief, InVue is aware or should have known that use and operation of one or more of the products identified in this Complaint in the United States by InVue or its customers would directly infringe the '140 Patent.

66.  InVue's actions to aid and abet its customers to directly infringe the '140 Patent with knowledge that use of one or more of the products identified in this Complaint in the United States would directly infringe the '140 Patent constitutes induced infringement.

67.  InVue's infringement by inducement of the '140 Patent causes financial damages to MTI, including for example, lost sales and revenue caused by InVue's sales of the infringing products identified in this Complaint.

68.  InVue's induced infringement of the '140 Patent irreparably damages MTI, including, for example, avoiding MTI's right to exclude others from making, using, selling, or offering to sell products in the United States or importing into the United States products embodying the invention patented in the '140 Patent.

69.  InVue's induced infringement of the '140 Patent will continue unless enjoined by the Court under 35 U.S.C. § 283 and/or the equitable powers of the Court.

# FOURTH CLAIM FOR RELIEF

## (Federal Unfair Competition)

70.  MTI fully incorporates by reference, as if set forth fully herein, the preceding paragraphs of this Complaint.

71.  InVue's marketing video entitled "InVue Security – Cost of Ownership" is literally false for the reasons discussed above.

72.  If not found to be literally false, InVue's marketing video entitled "InVue Security – Cost of Ownership" is at least misleading such that a substantial segment of the relevant customer base would be actually mistaken, deceived, or confused, and likely to be mistaken, deceived, or confused, about the nature, quality, and characteristics of MTI's Freedom Micro$^{TM}$ product.

73.  On information and belief, the amount of time a recoiler can be used in a retail store before failure (*i.e.*, the number of pulls a recoiler is capable of withstanding before failure) is material to the purchasing decision of a substantial segment of potential customers seeking to purchase mobile device display technologies and/or merchandising security for electronic devices.

74.  On information and belief, a substantial segment of customers is sensitive to the amount of time a recoiler can be used in a retail store before failure.

75.  On information and belief, InVue's false representations in the video entitled "InVue Security – Cost of Ownership" influenced the purchasing decision of a substantial number of relevant customers.

76.  On information and belief, InVue's false representations regarding the nature, quality, and characteristics of MTI's products, including the Freedom Micro$^{TM}$, were intentionally and/or willfully designed to unfairly compete and make sales that otherwise would not have been made.

77.  InVue's false representations detailed above were made, and continue to be made, in commercial advertising or promotion.  The false representations (1)

constitute commercial speech, (2) are made and authorized by InVue in an attempt to unfairly compete with MTI to try to capture additional sales, and (3) are made for the purpose of influencing customers and potential customers to purchase InVue's products instead of MTI's products.

78. MTI, purchasers, and potential purchasers will continue to be injured as a result of the false representations detailed above unless InVue is enjoined from committing further acts of false advertising and unfair competition.

## FIFTH CLAIM FOR RELIEF

### (California Business and Professions Code §§ 17200 *et seq.* and 17500)

79. MTI fully incorporates by reference, as if set forth fully herein, the preceding paragraphs of this Complaint.

80. The foregoing acts and conduct of InVue described above constitute unfair trade practices and unfair competition under California Business and Professions Code § 17200 *et seq.*, and False Advertising under California Business and Professions Code § 17500.

81. InVue's acts have caused, and continue to cause, damage to MTI, including, but not limited to, incidental and general damages, lost profits, and out-of-pocket expenses. InVue should therefore be required to disgorge and restore to MTI all profits and other expenses that have been, and will be, incurred by MTI.

82. MTI further seeks an injunction enjoining InVue from continue to engage in such unfair business practices and false advertising.

## PRAYER FOR RELIEF

WHEREFORE, MTI prays for judgment against Defendant InVue Security Products, Inc., as follows:

a) A judgment for MTI for all causes of action asserted within this Complaint;

b) An injunction, pursuant to 35 U.S.C. § 283, permitting MTI to seize and destroy all infringing products, and enjoining InVue and anyone acting in concert with it, including, but not limited to, their agents, officers, servants, employees, attorneys and all persons in active concert or participation with InVue who receive notice of the order, from further acts infringing U.S. Pat. No. 9,786,140, including the continued use of the infringing products;

c) A judgment awarding MTI all damages, including treble damages, based on any infringement of the '140 Patent found to be willful, pursuant to 35 U.S.C. § 284, together with prejudgment interest;

d) A judgment awarding MTI damages resulting from InVue's infringement of U.S. Pat. No. 9,786,140;

e) A judgment that U.S. Pat. No. 9,786,140 is valid and enforceable;

f) An injunction enjoining InVue and anyone acting in concert with it, including, but not limited to, their agents, officers, servants, employees, attorneys and all persons in active concert or participation with InVue who receive notice of the order, from continuing to make and publish false or misleading statements;

g) A judgment requiring InVue to correct any erroneous impression persons may have derived concerning the nature, quality, and characteristics of MTI's products stemming from InVue's false or misleading statements, including, but not limited to, the placement of corrective advertising on InVue's websites informing customers of its prior false or misleading statements regarding MTI's products;

h) A judgment awarding MTI in an amount sufficient to compensate it for the damage caused by InVue's unfair competition and false advertising;

1      i)   A judgment awarding MTI any and all profits InVue derived by reason of

2          its unfair competition and damages;

3      j)   Such other relief as this Court deems just and proper.

7  Dated: October 13, 2017           Respectfully submitted,

9                          THOMPSON COBURN LLP

11                        /s/ Brian G. Arnold

                        Brian G. Arnold, CA 186007

                        David B. Jinkins, MO 49254

                        Matthew A. Braunel, MO 50711

                        Alan H. Norman, MO 38555

                        Steven E. Garlock, MO 38346

                        Robert D. Gerlach, MO 67110

                        2029 Century Park E #1900

                        Los Angeles, CA 90067

                        (314) 552-6000

                        **_Attorneys for Plaintiff_**

- 28 -